Howard J. McClure, Esq.
Aubrey J. McClure Campbell, Esq.
Howard J. McClure & Associates
743 N. A Street
Oxnard, CA 93030
Telephone: (805) 278-6117
Facsimile: (805) 278-6119

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

JUAREZ PEREZ, Luis

Petitioner,

vs.

WARDEN, Adelanto ICE Processing Center; TODD BLANCHE, Attorney General of The United States; MARKWAYNE MULLIN, Secretary of Homeland Security,

Respondents.

Case No.

Hon.

**PETITION FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

1. Petitioner Luis Fernando Juarez-Perez ("Mr. Juarez-Perez") is twenty years old. He is a citizen of Mexico, a member of the Zapotec indigenous community of Oaxaca, and an agricultural worker who has lived and worked in Oxnard, California, since entering the United States in or about May 2024. (Exhibit I (Declaration of Luis Fernando Juarez-Perez) ¶¶ 1–2.) He has no criminal history of any kind. (Exhibit I ¶ 4; Exhibit C (I-213) at 2–3.) He is the father of two young sons; the younger, born at an Oxnard hospital in September 2025, is a United States citizen. (Exhibit G (birth certificates); Exhibit I ¶ 3.) In July 2025, he voluntarily presented himself to ICE, which released him on his own recognizance; he complied with that release for the following eleven months. (Exhibit I ¶¶ 5–6.) He has been confined at the Adelanto ICE Processing Center ("Adelanto") since June 25, 2026—now more than two months.

2. Mr. Juarez-Perez's custody began with racial profiling. On June 25, 2026, ICE officers hunting a different man in Van Nuys stopped Mr. Juarez-Perez because, in their visual estimation, he "resembl[ed]" that man's "physical description." (Exhibit C at 2.) That is the entirety of the government's own contemporaneous justification. The I-213 records no conduct by Mr. Juarez-Perez—no flight, no evasion, no violation of any law—that prompted the stop; only his proximity to an address and his appearance. Officers had no warrant

for his arrest, and they made no determination—because none was possible—that he was likely to escape before a warrant could be obtained: ICE had released this same man on his own recognizance eleven months earlier and knew exactly where he lived. His seizure and arrest violated the Fourth Amendment, the equal protection guarantee of the Fifth Amendment, and ICE's own governing regulations. And the arrest record itself misdescribes him: it misstates his date of birth, asserts that he has no children (he has two young sons, one a United States citizen), attributes to him an artificial right arm that he does not have, and records that he "claims no fear of returning to his country of Mexico"—a man who filed an asylum application six weeks later. (Exhibit C at 1, 3; Exhibit I ¶ 19.)

3. Mr. Juarez-Perez's custody has continued without process. In the more than two months since his arrest, no decisionmaker—not ICE, not an Immigration Judge, not anyone—has made an individualized determination that his confinement serves any purpose. No one has ever held a hearing on his custody, asked him a single question about whether he needs to be detained, or told him why he must remain locked up. (Exhibit I ¶ 13.)

4. Nor is Respondents' decision to confine him merely unexplained. It reverses their own prior judgment. ICE itself determined in July 2025 that Mr. Juarez-Perez could be released on his own recognizance, and for the eleven months that followed he proved that judgment correct—the same address, the same work,

no violation of any condition of release, and no suggestion from the agency to the contrary. (Exhibit I ¶¶ 5–6.) When the Government grants a person conditional liberty, due process forbids taking it back without notice and a hearing held before the deprivation. *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973); *Young v. Harper*, 520 U.S. 143, 152 (1997). Respondents afforded neither.

5. When Mr. Juarez-Perez sought protection from removal, the process he received only compounded the violation. He filed his application for asylum, withholding of removal, and protection under the Convention Against Torture on the morning of August 5, 2026, at his first master calendar hearing; DHS moved to pretermit it that same afternoon; and on August 24, 2026—before the next scheduled hearing, before any evidentiary deadline had passed, and before Mr. Juarez-Perez had answered a single question under oath—the Immigration Judge granted the motion on the papers, over his objection, and ordered him removed to Mexico. (Exhibit A (IJ Decision and Orders, Aug. 24, 2026); Exhibit I ¶¶ 14–15.)

6. The Immigration Judge's order was served on August 25, 2026. (Exhibit A.) Mr. Juarez-Perez expressly reserved appeal to the Board of Immigration Appeals ("BIA"), and his appeal is due September 23, 2026. He intends to appeal and his family is assembling the funds for the appeal filing fee so that a Notice of Appeal can be filed within the thirty-day period. (Exhibit I ¶ 16.)

[NOTE TO COUNSEL: INSERT THE FILING DATE HERE ONCE THE NOTICE OF APPEAL IS FILED.] Because appeal was expressly reserved and the period for seeking review has neither expired nor been waived, the removal order is not administratively final, see 8 U.S.C. § 1231(a)(1)(B)(i); 8 C.F.R. § 1241.1, and Mr. Juarez-Perez's removal proceedings remain pending. His detention pending those proceedings is civil, discretionary, and mandated by no statute. See 8 U.S.C. § 1226(a); *Rodriguez Vazquez v. Bostock*, No. 25-6842, --- F.4th ---, 2026 WL 2196424 (9th Cir. July 30, 2026) (noncitizens present without admission who are apprehended in the interior are detained under § 1226, not subject to mandatory detention under § 1225(b)(2)(A)).

7. *Rodriguez Vazquez* does more than fix the statutory label on Mr. Juarez-Perez's detention. It identifies the source—and therefore the limits—of Respondents' authority to arrest him. Section 1226(a) authorizes arrest and detention "[o]n a warrant issued by the Attorney General." 8 U.S.C. § 1226(a). No warrant issued for Mr. Juarez-Perez. The sole statutory exception permits a warrantless arrest only where the officer has reason to believe the person "is likely to escape before a warrant can be obtained for his arrest," 8 U.S.C. § 1357(a)(2); accord 8 C.F.R. § 287.8(c)(2)(ii)—a limited authority, cf. *Arizona v. United States*, 567 U.S. 387, 407 (2012), whose precondition was never satisfied here and, on the facts known to the officers, could not have been. An arrest in violation of these

provisions is unlawful, *Sanchez v. Sessions*, 904 F.3d 643, 650 (9th Cir. 2018); *Perez Cruz v. Barr*, 926 F.3d 1128, 1137 (9th Cir. 2019), and where the statutory precondition of the arrest was never satisfied, there is no authority to hold the person in immigration custody at all. The question this petition presents, in other words, is not the label on Mr. Juarez-Perez's detention. It is the lawfulness of Respondents' conduct: officers seized a man they were not looking for, on the basis of his apparent ethnicity, without a warrant, without reasonable suspicion, and without the escape-likelihood determination that is the statutory precondition of every warrantless immigration arrest. Immediate release is required.

8. To be clear about what this petition is—and is not: Mr. Juarez-Perez does not ask this Court to review his removal order. That order is the subject of his forthcoming administrative appeal to the BIA and, if necessary, a petition for review in the court of appeals. See 8 U.S.C. § 1252(a)(5), (b)(9). Nor does he ask this Court to suppress evidence in, or terminate, his removal proceedings. This petition challenges only the lawfulness of his ongoing physical custody—the question that lies at the historic core of the writ. See 28 U.S.C. § 2241(c)(3); *Demore v. Kim*, 538 U.S. 510, 516–17 (2003); *Jennings v. Rodriguez*, 583 U.S. 281, 292–96 (2018) (plurality opinion) (8 U.S.C. § 1252(b)(9) does not bar challenges to detention).

9. Mr. Juarez-Perez's injury is not the absence of any particular procedure. His injury is his confinement: a confinement that began with an unconstitutional, race-based seizure and that has continued for more than two months without any individualized justification, sustained now only by a removal order that Respondents obtained through a truncated process over his objection. The remedy the writ has always supplied for unlawful confinement is release. *Fay v. Noia*, 372 U.S. 391, 400 (1963), overruled in part on other grounds by *Wainwright v. Sykes*, 433 U.S. 72 (1977), and *Coleman v. Thompson*, 501 U.S. 722 (1991).

10. Accordingly, Mr. Juarez-Perez seeks a writ of habeas corpus requiring that Respondents release him from custody within one day; enjoining Respondents from transferring him from this District or removing him from the United States while these proceedings and his removal proceedings remain pending; and enjoining Respondents from redetaining him without advance notice and a hearing, held before any redetention, at which the Government bears the burden of justifying any renewed deprivation of his liberty.

## JURISDICTION

11. Petitioner Juarez-Perez is in the physical custody of Respondents. Petitioner is detained at the Adelanto ICE Processing Center in Adelanto, California.

12. This Court has jurisdiction under 28 U.S.C. § 2241 (habeas corpus); 28 U.S.C. § 1331 (federal question); and Article I, section 9, clause 2 of the United States Constitution (the Suspension Clause).

13. This Court may grant relief pursuant to 28 U.S.C. § 2241, the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the All Writs Act, 28 U.S.C. § 1651.

14. Neither 8 U.S.C. § 1252(g), § 1252(a)(5), nor § 1252(b)(9) bars this collateral challenge to the lawfulness of Petitioner's present confinement, because Petitioner does not challenge the commencement or adjudication of his removal proceedings or the execution of any removal order. "[C]laims that are independent of or collateral to the removal process do not fall within the scope of § 1252(b)(9)." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016); see *Jennings v. Rodriguez*, 583 U.S. 281, 294–96 (2018) (plurality opinion). Nor does 8 U.S.C. § 1226(e) apply: it shields discretionary judgments from review, not the antecedent questions whether detention is authorized at all and whether the procedures attending it satisfy the Constitution. *Jennings*, 583 U.S. at 295; *Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017).

## VENUE

15. Venue is proper in the Central District of California under 28 U.S.C. § 2241 and 28 U.S.C. § 1391. Petitioner is detained in an immigration detention

facility at the direction of, and is in the immediate custody of, Respondent Warden of the Adelanto ICE Processing Center. See *Rumsfeld v. Padilla*, 542 U.S. 426, 434–47 (2004) (immediate-custodian rule and district-of-confinement principle).

16. Venue is also properly in this Court pursuant to 28 U.S.C. § 1391(e) because Respondents are employees, officers, and agencies of the United States, and because a substantial part of the events or omissions giving rise to the claims and relevant facts occurred in this district.

## REQUIREMENTS OF 28 U.S.C. § 2243

17. The Court must grant the petition for a writ of habeas corpus or order Respondents to show cause "forthwith," unless the petitioner is not entitled to relief. 28 U.S.C. § 2243. If an order to show cause is issued, the Respondents must file a return "within three days unless for good cause additional time, not exceeding twenty days, is allowed." *Id.*

18. Habeas corpus is "perhaps the most important writ known to the constitutional law . . . affording as it does a swift and imperative remedy in all cases of illegal restraint or confinement." *Fay v. Noia*, 372 U.S. 391, 400 (1963). "The application for the writ usurps the attention and displaces the calendar of the judge or justice who entertains it and receives prompt action from him within the four corners of the application." *Yong v. I.N.S.*, 208 F.3d 1116, 1120 (9th Cir. 2000) (citation omitted).

## PARTIES

19. Petitioner Luis Fernando Juarez-Perez is a citizen of Mexico who has resided in the United States since May 2024. He has been in immigration detention since June 25, 2026, and is currently detained at the Adelanto ICE Processing Center ("Adelanto"). At no point in his more than two months of confinement has any decisionmaker made an individualized determination that his detention is justified.

20. Respondent Warden of the Adelanto ICE Processing Center is Petitioner's immediate custodian. As Warden, he or she has direct physical custody of Petitioner and is responsible for the day-to-day operation of the facility in which Petitioner is detained. The Warden is sued in his or her official capacity.

21. Respondent [DIRECTOR NAME], Director, Los Angeles Field Office, ICE Enforcement and Removal Operations, is Petitioner's custodian by virtue of his or her supervision of the Adelanto ICE Processing Center. As Director, he or she is responsible for the detention and removal of noncitizens within the Los Angeles Field Office's area of responsibility, and is sued in his or her official capacity.

22. Respondent Markwayne Mullin is the Secretary of the Department of Homeland Security. He is responsible for the implementation and enforcement of the INA and oversees ICE, which is responsible for Petitioner's detention. Mr.

Mullin has ultimate custodial authority over Petitioner and is sued in his official capacity.

23. Respondent Department of Homeland Security ("DHS") is the federal agency responsible for implementing and enforcing the INA, including the detention and removal of noncitizens.

24. Respondent Todd Blanche is the Attorney General of the United States. He is responsible for the Department of Justice, of which the Executive Office for Immigration Review and the immigration court system it operates are component agencies. He is sued in his official capacity.

25. Respondent Executive Office for Immigration Review ("EOIR") is the federal agency responsible for implementing and enforcing the INA in removal proceedings.

## FACTS

26. Mr. Juarez-Perez is twenty years old and a citizen of Mexico. He was born in Oaxaca, Mexico, on October 3, 2005. (Exhibit D (Form I-589) at 1 (pin citations to Exhibit D are to the page numbers printed on the form); Exhibit G (Certification of Vital Record, County of Ventura, recording the father's date of birth as 10/03/2005 and his birthplace as "OAX, MX"); Exhibit I ¶ 1.) He and his family are Zapotec, an indigenous people of that region, and he speaks Zapotec and Spanish as his native languages. (Exhibit D at 5–6 ("My family is Zapotec"; "I am

Zapotec. I am indigenous."); Exhibit I ¶ 1.) He entered the United States without inspection in or about May 2024. (Exhibit D at 1; Exhibit I ¶ 2.) Since his entry he has resided at a single address in Oxnard, California—321 Anita Avenue—and has supported himself through agricultural field work. (Exhibit D at 4; Exhibit I ¶ 2.) His partner, Paula Vasquez, and he are the parents of two young sons; the younger, Petitioner's eleven-month-old son, was born at St. John's Regional Medical Center in Oxnard on September 28, 2025, and is a citizen of the United States. (Exhibit G (birth certificates); Exhibit I ¶ 3.)

27. On July 24, 2025, Mr. Juarez-Perez voluntarily presented himself at the ICE Enforcement and Removal Operations office in Camarillo, California, after his partner was told to have him come in for a check-in. He had had no prior contact with immigration officials. He answered the officers' questions, and ICE released him on his own recognizance but did not serve him with a Notice to Appear. (Exhibit I ¶ 5; Exhibit C at 3; Exhibit D at 8.) ICE had his home address. (Exhibit I ¶ 5.)

28. For the eleven months that followed, Mr. Juarez-Perez remained at the same address in Oxnard and continued working in the fields. He did everything ICE asked of him. He was never told that he had violated any condition of his release. He never hid from ICE, and ICE always knew where to find him. (Exhibit I ¶ 6.)

29. On June 25, 2026, ICE's Van Nuys Fugitive Operations Team conducted a targeted field operation to locate and apprehend a different individual—Douglas Enemias Perez-Perez, a man with a criminal record—at 6257 Hazeltine Avenue in Van Nuys, California. (Exhibit C at 2.) At approximately 11:40 a.m., officers "observed a male subject resembling PEREZ-Perez's physical description near the target address" and approached Mr. Juarez-Perez to conduct a "field interview." (*Id.*) The same document, however, records that Mr. Juarez-Perez was "ARRESTED AT/NEAR 14109 DELANO ST, VAN NUYS, CALIFORNIA"—not at the Hazeltine Avenue address the officers were watching. (*Id.*) On the government's own record, then, the man the officers stopped was neither the man they were looking for nor at the place they expected to find him.

30. That visual impression of "resembl[ance]" is the entirety of the justification the government's contemporaneous record supplies for the stop. The I-213 records no conduct by Mr. Juarez-Perez that prompted it: he was not fleeing, was not evading the officers, and was not violating any law—only his proximity to an address at midday and his appearance. (*Id.*) The I-213 does not state what the target's "physical description" consisted of, and it identifies no characteristic connecting Mr. Juarez-Perez to Douglas Perez-Perez beyond the officers' visual impression of two Latino men.

31. The officers did not tell Mr. Juarez-Perez why they had approached him. They never showed him a warrant. They never showed him a photograph of anyone, never told him that he looked like a person they were looking for, and never mentioned the name Douglas Perez-Perez. (Exhibit I ¶ 8.) Mr. Juarez-Perez is not Douglas Perez-Perez, does not know anyone by that name, and has no connection to the neighborhood in which the operation was taking place. (Exhibit I ¶ 9.)

32. The I-213's description of Mr. Juarez-Perez is, in material respects, a description of someone he is not. It records his date of birth as March 10, 2005; his date of birth is October 3, 2005, as a certified California vital record issued eight months before this arrest independently confirms. (*Compare* Exhibit C at 1 *with* Exhibit D at 1, Exhibit G, and Exhibit I ¶ 1.) That error did not stay in the I-213: it was carried forward into the Notice to Appear, which repeats the same incorrect date. (Exhibit B.) The I-213 also states that Mr. Juarez-Perez "does not have children or dependents"; he is the father of two young sons, one of them a United States citizen born in Oxnard less than nine months before this arrest. (*Compare* Exhibit C at 1 *with* Exhibit G and Exhibit I ¶ 3.) It attributes to him an "ARTIFICIAL ARM, RIGHT"; Mr. Juarez-Perez has no artificial limb—both of his arms are his natural arms. (Exhibit C at 1; Exhibit I ¶ 19.) And it reports that he "claims no fear of returning to his country of Mexico" (Exhibit C at 3), a statement

irreconcilable with the asylum, withholding, and CAT application he filed six weeks later, in which he describes the murder of two relatives by the cartel that controls his home community (Exhibit D at 5–6). The one document that exists to justify Mr. Juarez-Perez's seizure cannot accurately describe the man who was seized.

33. Officers questioned Mr. Juarez-Perez. He did not run and did not resist in any way. He stayed where he was and answered truthfully, identifying himself, acknowledging that he is a citizen of Mexico, and stating that he did not have identification with him. (Exhibit C at 2; Exhibit I ¶ 10.) At approximately 11:45 a.m.—five minutes after officers first observed him—they arrested him without a warrant under 8 U.S.C. § 1357(a)(2), citing his own truthful answers as probable cause. (Exhibit C at 2; Exhibit I ¶ 11.) The I-213 contains no determination that Mr. Juarez-Perez was likely to escape before a warrant could be obtained—the statutory and regulatory precondition to a warrantless immigration arrest, see 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii)—and no such determination was possible: ICE had released this same man on his own recognizance eleven months earlier, knew his address of record, and knew he had voluntarily presented himself to the agency.

34. Mr. Juarez-Perez has no criminal history. He has never been arrested for or charged with any crime, in the United States or in Mexico. (Exhibit I ¶ 4.)

ICE's own records checks—TECS, NCIC, and IAFIS—returned negative results, and the I-213 records his criminal history as "NONE" with "Negative Wants/Warrants." (Exhibit C at 2–3.)

35. Officers took Mr. Juarez-Perez to a building at 300 N. Los Angeles Street in Los Angeles and later transferred him to Adelanto, where he has been detained ever since. (Exhibit I ¶ 12.) DHS served him with a Notice to Appear dated June 25, 2026, charging him as removable under 8 U.S.C. § 1182(a)(6)(A)(i) as a noncitizen present in the United States without being admitted or paroled, and placed him in removal proceedings under 8 U.S.C. § 1229a before the Adelanto Immigration Court. (Exhibit B (Notice to Appear).) ICE determined that he would "remain in custody pending his immigration proceedings." (Exhibit C at 3.)

36. Respondents effected the arrest without any warrant. The I-213 records the arrest as made under 8 U.S.C. § 1357(a)(2), the warrantless-arrest provision. (Exhibit C at 2.) Respondents did not issue a Form I-200, Warrant of Arrest, before arresting Mr. Juarez-Perez, and never showed him one. (Exhibit I ¶ 8.) See 8 C.F.R. § 236.1(b) (authorizing arrest "under the authority of Form I-200, Warrant of Arrest"). Respondents' own record confirms that the warrant followed the arrest rather than authorizing it. The I-213 narrative states that Mr. Juarez-Perez "was transported to 300 N. Los Angeles staging facility in Los Angeles, CA for processing," and only then that he "was served a Warrant for Arrest of Alien

(I-200) when safe to do so.” (Exhibit C at 2–3.) On Respondents’ own account, then, whatever Form I-200 exists was served after Mr. Juarez-Perez had already been seized, transported, and booked.

37. No custody determination followed, either. Because the arrest was warrantless, 8 C.F.R. § 287.3(d) required a determination, “within 48 hours of the arrest,” of whether Mr. Juarez-Perez would be continued in custody or released, and of whether a notice to appear and warrant of arrest would issue. Respondents made the charging determination the same day—the Notice to Appear is dated June 25, 2026—and never made the custody determination at all. The I-213’s notation that Mr. Juarez-Perez would “remain in custody pending his immigration proceedings” (Exhibit C at 3) records the automatic consequence of Respondents’ policy of treating people like him as subject to mandatory detention; it reflects no consideration of the individualized factors that govern custody decisions, see 8 C.F.R. § 1236.1(c)(8), and no Form I-286, Notice of Custody Determination, was ever issued or served.

38. Nothing in the record reflects that any officer, at any point in more than two months, has weighed whether this man—who came to ICE voluntarily and complied with his release for eleven months—needs to be confined. As Mr. Juarez-Perez puts it: no judge or officer has ever held a hearing or asked him any

questions about whether he needs to be detained, and no one has ever told him why he has to stay locked up. (Exhibit I ¶ 13.)

39. On August 5, 2026, at his first master calendar hearing, Mr. Juarez-Perez appeared through counsel, conceded removability, and filed his Form I-589 application for asylum, withholding of removal, and protection under the Convention Against Torture. (Exhibit D; Exhibit I ¶ 14.) His application alleges that the cartel that has overtaken his home community murdered two of his relatives in their home; that his Zapotec family is particularly exposed to cartel violence; and that local police, who are connected to the cartel, did not investigate. (Exhibit D at 5–6; Exhibit I ¶ 14.)

40. That same afternoon, DHS moved to pretermit all three protection applications. (Exhibit E (DHS Motion to Pretermit).) DHS advanced two grounds: principally, that the allegations underlying the applications did not establish prima facie eligibility under *Matter of H-A-A-V-*, 29 I&N Dec. 233, 238 (BIA 2025); and, in the alternative, that Mr. Juarez-Perez "is subject to an Asylum Cooperative Agreement (ACA) rendering the respondent ineligible for asylum or related protection in the United States." (*Id.*)

41. On August 20, 2026, Mr. Juarez-Perez filed an opposition, asking the Immigration Court to deny the motion or, in the alternative, to defer ruling until the next master calendar hearing, then set for September 16, 2026, at which counsel

would delineate the proposed protected grounds on the record and the first evidentiary deadlines would be set. (Exhibit F (Opposition).)

42. On August 24, 2026—four days after the opposition was filed, and more than three weeks before the scheduled hearing—the Immigration Judge granted the motion, pretermitted and denied the applications for asylum, withholding of removal, and CAT protection, ordered Mr. Juarez-Perez removed to Mexico, and canceled the upcoming hearing. (Exhibit A.) Mr. Juarez-Perez was never examined under oath on his application, no individual hearing was ever scheduled, and no deadline for supporting evidence had passed. (Exhibit I ¶ 15.)

43. Mr. Juarez-Perez expressly reserved appeal, and his appeal to the BIA is due September 23, 2026. The Immigration Judge's order was served on counsel on August 25, 2026. (Exhibit A.) Mr. Juarez-Perez intends to pursue the appeal, and his family is assembling the funds for the appeal filing fee so that a Notice of Appeal can be filed within the thirty-day period. (Exhibit I ¶ 16.)

44. The speed of these proceedings has thus imposed its own burden: within thirty days, the family of a detained twenty-year-old agricultural worker must assemble a filing fee to preserve claims that were extinguished nineteen days after they were filed. Because appeal was expressly reserved and the appeal period has neither expired nor been waived, the removal order is not administratively

final. See 8 U.S.C. § 1231(a)(1)(B)(i); 8 C.F.R. § 1241.1. His removal proceedings therefore remain pending.

45. Mr. Juarez-Perez has now been confined for more than two months. In that time, no decisionmaker has made—or even been asked by Respondents to make—an individualized determination that his detention is justified by any risk he presents. The facts point the other way: he voluntarily presented himself to ICE in July 2025 and complied fully with his release on recognizance for eleven months; he has maintained a single, stable residence in Oxnard and steady agricultural employment; he has no criminal history whatsoever; his partner and two young sons—including his infant United States citizen son—are in Oxnard (Exhibit G); and he is diligently pursuing his protection claims with retained counsel.

46. If released, Mr. Juarez-Perez will live at 321 Anita Avenue in Oxnard with his partner and children, and a full-time irrigation position at 3H Custom Farming, Inc. of Oxnard awaits him, Monday through Friday, on the written commitment of the company's owner. (Exhibit H (employment offer letter, July 9, 2026); Exhibit I ¶ 18.) He has stated under penalty of perjury that he will attend every appointment ICE gives him, just as he appeared voluntarily in July 2025, and that he has nowhere to hide and no reason to hide: his home, his family, and his work are all in Oxnard, and he is fighting his case. (Exhibit I ¶ 18.)

47. Without relief from this Court, Petitioner faces the prospect of many more months of detention while his BIA appeal is adjudicated—BIA appeals routinely take six months to a year to resolve—separated from his family and community, in custody that no one has ever justified and that began with an unconstitutional seizure.

## LEGAL FRAMEWORK

48. The writ of habeas corpus extends to any person "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Immigration detention is civil detention, and "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that the [Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Civil confinement is constitutional only where its nature and duration bear a reasonable relation to a legitimate, non-punitive purpose. *See id.* at 690–91; *Jackson v. Indiana*, 406 U.S. 715, 738 (1972).

49. Petitioner's detention is not mandated by any statute. Because his removal order is not administratively final and his proceedings remain pending, his detention is discretionary civil detention under 8 U.S.C. § 1226, see *Rodriguez Vazquez v. Bostock*, No. 25-6842, 2026 WL 2196424 (9th Cir. July 30, 2026); see also *Torres v. Barr*, 976 F.3d 918, 927 (9th Cir. 2020) (en banc); it is not detention

under 8 U.S.C. § 1231, see 8 C.F.R. § 1241.1; and no criminal ground brings him within 8 U.S.C. § 1226(c). Whatever authority Respondents have to detain him, that authority is subject to the Fourth and Fifth Amendments.

50. The structure of § 1226(c) confirms that Mr. Juarez-Perez is not subject to mandatory detention. As amended by the Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025), § 1226(c)(1)(E) subjects noncitizens charged under INA § 212(a)(6) to mandatory detention if they are arrested for, charged with, or convicted of certain offenses, or if they admit having committed such an offense or admit committing acts that constitute its essential elements.

51. Mr. Juarez-Perez is charged under INA § 212(a)(6)(A)(i), but no prong of § 1226(c)(1)(E) reaches him. He has never been arrested for, charged with, or convicted of any offense anywhere, and he has never admitted committing any such offense or any act constituting its elements. The I-213 records his criminal history as "NONE" and his wants-and-warrants check as negative, and it attributes to him no admission of criminal conduct of any kind. (Exhibit C at 2–3; Exhibit I ¶ 4.) He falls outside § 1226(c) and is detained, if at all, under § 1226(a).

52. Section 1226(a) is also the source of Respondents' arrest authority, and it begins with a warrant requirement: "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a) (emphasis

added). Its implementing regulations prescribe a sequence of protections: arrest "under the authority of Form I-200, Warrant of Arrest," 8 C.F.R. § 236.1(b); an initial custody determination measured against whether release would pose a danger and whether the person is likely to appear, *id.* § 1236.1(c)(8); for warrantless arrests, a custody determination within 48 hours, *id.* § 287.3(d); and review of that determination before an Immigration Judge, *id.* §§ 1236.1(d)(1), 1003.19. See *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1202 (9th Cir. 2022) (§ 1226(a) "and its implementing regulations provide extensive procedural protections," including "several layers of review" of custody). Mr. Juarez-Perez received none of this: no warrant, no individualized custody determination, no 48-hour review, and no notice of any mechanism for seeking one.

**A.**

**The Seizure of Mr. Juarez-Perez Violated the Fourth Amendment**

53. An investigative stop must be supported by reasonable suspicion grounded in specific, articulable facts particular to the person seized. In the immigration-enforcement context specifically, the Supreme Court held half a century ago that apparent Mexican ancestry, standing alone, cannot justify a stop. *United States v. Brignoni-Ponce*, 422 U.S. 873, 885–87 (1975).

54. In this Circuit, Hispanic appearance is "of such little probative value" in areas of substantial Hispanic population "that it may not be considered as a

relevant factor" in the reasonable-suspicion analysis at all. *United States v. Montero-Camargo*, 208 F.3d 1122, 1135 (9th Cir. 2000) (en banc).

55. The government's own contemporaneous record shows the stop of Mr. Juarez-Perez rested on nothing more. The articulated basis was that a "male subject resembling" another Latino man's unspecified "physical description" was "near the target address." (Exhibit C at 2.) Proximity to an address in a residential neighborhood of Van Nuys at midday is a circumstance shared by everyone who happens to be there; a generic visual "resembl[ance]" between two young Latino men, in a region where millions of people share that description, is precisely the appearance-based judgment *Brignoni-Ponce* and *Montero-Camargo* condemn. The record discloses no conduct, no evasion, no tip, and no fact particular to Mr. Juarez-Perez.

56. Mr. Juarez-Perez's own account confirms the emptiness of the asserted basis. The officers never showed him a photograph of the man they were looking for, never told him he resembled anyone, and never mentioned that man's name. (Exhibit I ¶ 8.) He has no connection to that neighborhood and does not know Douglas Perez-Perez. (*Id.* ¶ 9.) And the reliability of even the thin justification the record does supply is undermined by the I-213 itself, which misstates Mr. Juarez-Perez's date of birth, denies the existence of his two children, attributes to him an artificial right arm he does not have, and places his arrest at an

address other than the one the officers were watching. (Exhibit C at 1–2; Exhibits D, G; Exhibit I ¶ 19.) A record that cannot accurately describe the man the officers seized cannot supply reasonable suspicion for seizing him. The seizure was unsupported by reasonable suspicion and violated the Fourth Amendment.

**B.**

**The Warrantless Arrest Violated the Statute and ICE's Own Regulations**

57. Congress authorized warrantless immigration arrests only where the officer "has reason to believe" the person "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2). ICE's own regulations impose the same precondition, 8 C.F.R. § 287.8(c)(2)(ii), and require that any interrogation or detention short of arrest be founded on reasonable suspicion, *id.* § 287.8(b)(2). An agency is bound by its own regulations. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265–68 (1954).

58. The statute's two requirements are conjunctive and independent. The first concerns removability; the second concerns something different—whether this person, on the facts known to the officer at the time, is likely to flee before a warrant can be obtained. A belief that a person is removable cannot itself supply the escape element: on that reading, every warrantless immigration arrest would satisfy both requirements automatically, the exception would swallow § 1226(a)'s warrant rule, and the phrase "is likely to escape before a warrant can be obtained"

would do no work. The escape determination is also necessarily individualized—it turns on facts particular to the person, such as residence, employment, family ties, and history—and necessarily antecedent: the statute permits a warrantless arrest only where a warrant cannot be obtained in time, a judgment that must be made before the arrest rather than reconstructed after it. And the "reason to believe" the statute demands is the equivalent of Fourth Amendment probable cause. *Perez Cruz v. Barr*, 926 F.3d 1128, 1137 (9th Cir. 2019); *Tejeda-Mata v. INS*, 626 F.2d 721, 725 (9th Cir. 1980).

59. No escape-likelihood determination appears anywhere in the record, and the known facts foreclosed one: Respondents had released Mr. Juarez-Perez on his own recognizance eleven months earlier, held his address of record, and knew that he had come to them voluntarily. An officer with those facts could not reasonably believe that a warrant could not be obtained in the ordinary course for a man who had already demonstrated, at length, that he was not going anywhere. The warrantless arrest violated § 1357(a)(2) and § 287.8(c)(2)(ii).

60. The speed of the encounter confirms the point: officers went from first observation to arrest in five minutes, on the strength of a visual impression, with every records check run only after Mr. Juarez-Perez was in custody. (Exhibit C at 2–3.) They could not have formed—and the record shows they did not form—any

individualized, antecedent belief that he was likely to escape before a warrant could be obtained.

61. Nor does after-the-fact paperwork cure the defect. Respondents' own narrative places service of the Form I-200 after Mr. Juarez-Perez had been seized and transported for processing, "when safe to do so." (Exhibit C at 2–3.) A warrant served on a man already in custody documents the detention; it does not retroactively supply the authority that was missing at the moment of the seizure. An arrest in violation of § 1357(a)(2) and § 287.8(c)(2)(ii) is unlawful, *Sanchez v. Sessions*, 904 F.3d 643, 650 (9th Cir. 2018), and custody premised on it has been unauthorized from its inception.

62. Respondents' regulatory violations did not end with the arrest. Because the arrest was warrantless, 8 C.F.R. § 287.3(d) required a custody determination within 48 hours; as set forth above, none was made—then or ever. The regulation extends that period only "in the event of an emergency or other extraordinary circumstance," and then only "within an additional reasonable period of time." *Id.* Nothing in this record suggests any emergency or extraordinary circumstance: Mr. Juarez-Perez was arrested during a routine midday field operation, was processed the same day, and was served with a Notice to Appear dated the day of his arrest. (Exhibit B; Exhibit C at 2–3.) Respondents managed the charging determination within hours. They have not made the custody

determination in more than two months. Respondents cannot escape these violations from either direction. If the arrest was made under § 1357(a)(2), then § 287.3 governed Mr. Juarez-Perez's processing by its terms, and Respondents ignored it. If Respondents instead contend that a warrant authorized the arrest, no warrant existed when he was seized, and § 1226(a) was violated. Either way, the custody that followed has never rested on lawful process.

63. A violation of the agency's own regulations warrants relief where the regulation serves a purpose of benefit to the person and the violation prejudiced the interests it protects. *United States v. Calderon-Medina*, 591 F.2d 529, 531 (9th Cir. 1979); see *Sanchez*, 904 F.3d at 649–50. Both conditions are met: the custody regulations exist to ensure that no one is confined absent a determination that confinement is justified, and their breach has cost Mr. Juarez-Perez more than two months of physical liberty with no such determination ever made. Courts have granted habeas relief on materially similar facts. See *Dos Reis v. McShane*, No. 26-cv-3775, 2026 WL 1746649, at *4 (E.D. Pa. June 17, 2026); *Cajamarca-Janza v. Soto*, No. 26-cv-3066 (HG), 2026 WL 1506777, at *3–5 (E.D.N.Y. 2026); *Curimilma Quille v. Blanche*, No. 26-cv-2818, 2026 WL 1453889, at *3–5 (E.D.N.Y. May 22, 2026); *Pastrana-Beltran v. Mullin*, No. 26-cv-2657, 2026 WL 1398609, at *2 (E.D.N.Y. May 19, 2026).

### C.

### The Violations Were Egregious, and Custody Founded on Them Is Unlawful

64. The Ninth Circuit has long held that a stop based on race or apparent ethnicity is an egregious violation of the Fourth Amendment—one committed in bad faith, because no reasonable officer could believe such a stop lawful. *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1449–52 (9th Cir. 1994); see also *Orhorhaghe v. INS*, 38 F.3d 488, 493, 497–504 (9th Cir. 1994) (seizure premised on a foreign-sounding name was an egregious violation).

65. Petitioner does not ask this Court to suppress evidence in his removal proceedings or to terminate them; those questions belong to the immigration courts and, on review, to the court of appeals. What Petitioner challenges is his ongoing physical custody. Whatever the rules governing the use of evidence in removal proceedings, a person's continued imprisonment is a distinct injury, and imprisonment that originated in an egregious, race-based constitutional violation, that was effected through an arrest the statute and regulations did not authorize, and that has never since been subjected to any individualized justification, is custody "in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2241(c)(3). Habeas exists for exactly this.

66. Relief of this kind is neither novel nor extraordinary. Over the past year, federal courts in this District and across the country have repeatedly held that

immediate release from unlawful immigration detention is required by law, and have ordered it. *See, e.g.*, *Moreno Cristin v. Armant*, No. 5:26-cv-04024-DTB (C.D. Cal. July 29, 2026), Dkt. 10; *Urias v. Semaia*, No. 5:26-cv-02753-DTB, 2026 WL 1710375, at *6 (C.D. Cal. June 10, 2026); *Galvez Pantoja v. DHS*, No. 5:26-cv-02084-JDE, 2026 WL 1601897, at *4 (C.D. Cal. June 1, 2026); *Juarez Barrientos v. Moss*, No. 1:26-cv-05943-NW, 2026 WL 2283034, at *2 (E.D. Cal. Aug. 7, 2026); *Navarro Gomez v. Wofford*, No. 1:26-cv-05299 (VC), 2026 WL 2065708, at *3 (E.D. Cal. July 16, 2026); *J.A.C.P. v. Wofford*, No. 1:25-cv-01354-KES-SKO (HC), 2025 WL 3013328, at *8 (E.D. Cal. Oct. 27, 2025); *Gregorio v. Larose*, No. 3:26-cv-03918-RBM-SBC, 2026 WL 2059095, at *1 (S.D. Cal. July 16, 2026); *Lopez-Sanchez v. Blanche*, No. 8:26CV264, 2026 WL 1759557, at *3 (D. Neb. June 18, 2026); *Ahmed M. v. Bondi*, No. 25-cv-4711 (ECT/SGE), 2026 WL 25627, at *3 (D. Minn. Jan. 5, 2026); *Chiliquinga Yumbillo v. Stamper*, No. 2:25-cv-00479-SDN, 2025 WL 2783642, at *5 (D. Me. Sept. 30, 2025).

## D.

## The Race-Based Enforcement Violated Equal Protection

67. "[T]he Constitution prohibits selective enforcement of the law based on considerations such as race," and "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause."

*Whren v. United States*, 517 U.S. 806, 813 (1996). The equal protection guarantee binds the federal government through the Fifth Amendment's Due Process Clause. Respondents' officers singled out Mr. Juarez-Perez for a "field interview," and then for arrest, on the basis of his apparent race and ethnicity—the only characteristics the record connects to their decision to approach him. Mr. Juarez-Perez believes he was targeted because he is Hispanic. (Exhibit I ¶ 19.) Enforcement keyed to apparent ethnicity denies the equal protection of the laws, and custody that is the direct product of that discrimination is unlawful.

## E.

## Respondents Released Mr. Juarez-Perez and Then Revoked That Liberty Without Any Process

68. Respondents' own conduct answers the question whether Mr. Juarez-Perez must be confined. In July 2025, ICE took custody of him, questioned him, and released him on his own recognizance. (Exhibit I ¶ 5.) For the eleven months that followed he remained at the same address, worked in the same fields, and was never told that he had violated any condition of his release. (*Id.* ¶ 6.) The agency that now insists he must be jailed pending his removal proceedings had already concluded—and then confirmed through eleven months of experience—that he need not be.

69. "The touchstone of due process is protection of the individual against arbitrary action of government," *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974), including "the exercise of power without any reasonable justification in the service of a legitimate government objective," *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). Generally, "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990).

70. That requirement holds even where the liberty at issue is lawfully revocable. See *Young v. Harper*, 520 U.S. 143, 152 (1997) (redetention after pre-parole conditional supervision requires a pre-deprivation hearing); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (same, probation); *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) (same, parole; a grant of release carries an "implicit promise" that liberty will be revoked only for violation of release conditions); *Hurd v. District of Columbia*, 864 F.3d 671, 683 (D.C. Cir. 2017).

71. Courts have protected a noncitizen's liberty interest with particular force where it arises from a prior release. See *Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1032 (N.D. Cal. 2025); *Alegria Palma v. LaRose*, No. 25-cv-1942-BJC-MMP, ECF No. 14, at 6 (S.D. Cal. Aug. 11, 2025); *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 969 (N.D. Cal. 2019).

72. Mr. Juarez-Perez's release in July 2025 carried *Morrissey*'s implicit promise: that his liberty would be revoked, if at all, for some failure of his own. He committed none. He was not arrested for violating a condition of release—the government's contemporaneous record identifies no condition and no violation. He was arrested because officers looking for a different man thought he resembled that man. (Exhibit C at 2.)

73. Respondents revoked a liberty they had themselves conferred, without notice, without a hearing, and without alleging any reason connected to Mr. Juarez-Perez's own conduct. That is the arbitrary action against which the Due Process Clause protects.

**F.**

**Continued Detention Without Process Violates Due Process**

74. "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). A noncitizen's interest in freedom from physical confinement is itself a core liberty interest protected by the Due Process Clause. *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017). Immigration detention has only two permissible regulatory goals: ensuring the appearance of noncitizens at future immigration proceedings, and preventing danger to the community. *Zadvydas*, 533

U.S. at 690–93; see also *Demore v. Kim*, 538 U.S. 510, 519–20, 527–28 (2003); 8 U.S.C. § 1226(a), (b); 8 C.F.R. § 1236.1(c)(8).

75. Due process requires, at a minimum, that a civil detainee's confinement be justified—that its nature and duration bear a reasonable relation to a legitimate governmental purpose, *Jackson*, 406 U.S. at 738, assessed through procedures adequate to the private interest at stake, *Mathews v. Eldridge*, 424 U.S. 319, 333–35 (1976). Mr. Juarez-Perez's liberty interest is fundamental; the risk of erroneous deprivation, where no individualized determination of any kind has ever been made, is total; and the government has identified no interest that his particular confinement serves. More than two months into his detention, with many more months of administrative appeal ahead, Respondents have never once been required to explain why this man—who came to them voluntarily, complied with his release, and has no criminal record—must be confined at all.

76. The procedures § 1226(a) prescribes are the mechanisms by which the Government ensures that detention bears a reasonable relation to a permissible non-punitive purpose. "Section 1226(a) provides protections that safeguard Petitioner's due process protected interest in freedom from arbitrary confinement." *Dominguez Perez v. Santacruz*, No. 5:26-cv-03936-MBK, slip op. at 14 (C.D. Cal. July 30, 2026); accord *Garcia-Maya v. Mattos*, No. 2:26-cv-01513-RFB-BNW, 2026 WL 1965886, at *5 (D. Nev. July 7, 2026) (a petitioner "is entitled to the

procedural protections provided by § 1226(a), not merely by statute and regulation, but also by the Due Process Clause").

77. By arresting and detaining Mr. Juarez-Perez without lawful authority, Respondents denied him each of those protections—no Form I-200 warrant, no initial custody determination, no Form I-286, no determination within 48 hours of a warrantless arrest, and no review before an Immigration Judge—and thereby "created an unacceptably high risk that Petitioner's detention is not justified on danger or flight risk grounds." *Dominguez Perez*, slip op. at 14; see *Garcia-Maya*, 2026 WL 1965886, at *5, *8.

78. Detention is neither a required nor an exclusive means of securing Mr. Juarez-Perez's appearance. Respondents may place a noncitizen in removal proceedings and permit him to remain at liberty pending those proceedings, and where Respondents have concerns about appearance they may impose conditions of supervision, including reporting requirements and participation in alternatives to detention. See 8 U.S.C. § 1226(a)(2); 8 C.F.R. § 1236.1(c)(8), (d). Respondents have never contended that any condition short of confinement would be inadequate, because they never considered the question.

79. A hearing convened now also could not undo the deprivation already suffered. A post-deprivation hearing "cannot prevent an erroneous deprivation of liberty" that has already occurred, *E.A.T.-B. v. Wamsley*, 795 F. Supp. 3d 1316,

1324 (W.D. Wash. 2025); by the time any such hearing convened, Mr. Juarez-Perez would "already have suffered the injury he is now seeking to avoid," *Jorge M.F. v. Jennings*, 534 F. Supp. 3d 1050, 1055 (N.D. Cal. 2021).

80. Nor can Respondents justify the detention after the fact by pointing to the removal order as evidence that Mr. Juarez-Perez will abscond. That order is the product of Respondents' own haste: DHS moved to pretermit his protection applications hours after they were filed, and the Immigration Judge granted the motion on the papers—before any evidentiary deadline had passed, before any protected ground could be delineated on the record, before Mr. Juarez-Perez was ever placed under oath, and over his objection that the motion was premature. Whatever the ultimate merits of that order—a question for the BIA and, if necessary, the court of appeals—the circumstances of its entry mean it cannot fairly serve as a justification for confinement. Due process does not permit the government to manufacture, through a truncated process, the very fact it would then invoke to keep a man imprisoned. Having short-circuited the procedures that would ordinarily precede a removal order, Respondents cannot be permitted to trade on the resulting non-final order as a reason to continue Petitioner's detention.

**G.**

**No Exhaustion Requirement Bars This Petition**

81. No statutory exhaustion requirement applies to a habeas petition challenging immigration detention. *Singh v. Holder*, 638 F.3d 1196, 1203 n.3 (9th Cir. 2011); *Castro-Cortez v. INS*, 239 F.3d 1037, 1047 (9th Cir. 2001), abrogated on other grounds by *Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006). Any exhaustion requirement is prudential, not jurisdictional, and this Court has discretion to waive it. *Ward v. Chavez*, 678 F.3d 1042, 1045 (9th Cir. 2012); *Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017). Waiver is appropriate where "administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void." *Hernandez*, 872 F.3d at 988 (quoting *Laing v. Ashcroft*, 370 F.3d 994, 1000 (9th Cir. 2004)); accord *McCarthy v. Madigan*, 503 U.S. 140, 144–45 (1992), superseded by statute on other grounds as recognized in *Booth v. Churner*, 532 U.S. 731 (2001); *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007). Each of those grounds is satisfied here.

82. First, no administrative forum is capable of adjudicating, much less remedying, the claims presented here. Neither an Immigration Judge nor the Board has authority to adjudicate Petitioner's constitutional claims. *Matter of R-A-V-P-*, 27 I&N Dec. 803, 804 n.2 (BIA 2020); *Matter of C-*, 20 I&N Dec. 529, 532 (BIA 1992). Nor does either tribunal have authority to determine whether Respondents complied with 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8 when they seized

Petitioner without a warrant, or whether the resulting custody is authorized at all. An Immigration Judge conducting a custody redetermination decides only whether a detainee should be released on bond under the factors set out in *Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006). That proceeding does not reach, and could not resolve, whether Respondents possessed authority to arrest Petitioner in the first instance. A bond determination in Petitioner's favor would not adjudicate his claims, and a bond determination against him would not defeat them.

83. Second, Respondents may not fault Petitioner for failing to invoke a process they never made available to him. The ordinary mechanism by which a noncitizen requests review of a custody determination is a Form I-286, Notice of Custody Determination, issued following the initial custody determination. Respondents never made an individualized custody determination for Mr. Juarez-Perez and never served him a Form I-286. A court should "reject[] that Petitioner should have made a request for a bond hearing based on a process that was not made available to him." *Dominguez Perez*, slip op. at 13; accord *Garcia-Maya*, 2026 WL 1965886, at *5.

84. Third, the truncated course of Petitioner's removal proceedings—in which even the ordinary opportunities to be heard were extinguished on the papers—demonstrates the inadequacy of the administrative process he has actually received. And each additional day of unconstitutional confinement is itself

irreparable injury. "Deprivation of physical liberty by detention constitutes irreparable harm." *Arevalo v. Hennessy*, 882 F.3d 763, 767 (9th Cir. 2018). The Ninth Circuit has likewise recognized the "irreparable harms imposed on anyone subject to immigration detention," including "the economic burdens imposed on detainees and their families as a result of detention." *Hernandez*, 872 F.3d at 995. Mr. Juarez-Perez is the financial support of his household, and every additional day of his confinement compounds that harm. Habeas demands a "swift" remedy. *Fay v. Noia*, 372 U.S. at 400.

**H.**

**Immediate Release Is the Remedy the Writ Requires**

85. The remedy follows from the nature of the violation. "[T]he traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). Habeas remedies exist "to put the [person] back in the position he would have been in if the constitutional violation never occurred." *Lujan v. Garcia*, 734 F.3d 917, 935 (9th Cir. 2013) (cleaned up); see *United States v. Morrison*, 449 U.S. 361, 364 (1981) (remedies "should be tailored to the injury suffered"). This Court may dispose of the matter "as law and justice require," 28 U.S.C. § 2243, *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987), and may grant relief beyond bare release where necessary to make the writ effective. *Boumediene v. Bush*, 553 U.S. 723, 779–80 (2008).

86. Courts have ordered immediate release rather than a bond hearing on facts materially like these, and have done so even where the government offered a hearing as the remedy. In *Gregorio*, Respondents did not substantively oppose the petition and stated that they did not oppose an order directing a bond hearing under § 1226(a); the court nonetheless held that "immediate release, rather than a bond hearing, is the appropriate remedy," and enjoined redetention absent a hearing at which the Government must establish danger or flight risk by clear and convincing evidence. No. 3:26-cv-03918-RBM-SBC, Dkt. 6, at 3 (S.D. Cal. July 16, 2026). Courts have reached the same result in *Baltazar Raymundo v. Blanche*, No. 3:26-cv-03984-JO-SBC, Dkt. 6 ¶¶ 2–3 (S.D. Cal. July 27, 2026) (due process violated by "continuing to deprive him of his freedom from physical confinement without an individualized determination of flight risk or danger to the public"), and *Figueroa v. Casey*, No. 3:26-cv-03482-JO, Dkt. 5 ¶ 3 (S.D. Cal. June 22, 2026) ("[t]he absence of any individualized determination significantly risks erroneously depriving Petitioner of his liberty interest"). Petitioner's circumstances are at least as favorable: he has no criminal history of any kind, a fixed address and steady work since his entry, a United States citizen infant son, a written offer of full-time employment awaiting his release, and a prior period of compliant release on recognizance.

87. There is no omitted procedure for this Court to compel instead of release. Petitioner's claim is not that Respondents skipped steps within a detention they were authorized to effect; it is that Respondents lacked authority to seize him at all—no warrant, no reasonable suspicion, no escape-likelihood determination, and a stop keyed to his apparent ethnicity. An order directing Respondents to supply process now would restore Petitioner only to the position he would have occupied had Respondents processed him correctly after unlawfully arresting him. It would not restore him to the position he would have occupied had the unlawful seizure never occurred—the position habeas exists to restore. That position is liberty. And because release alone would leave Respondents free to redetain Petitioner on the same unlawful basis, complete relief requires that any future redetention be preceded by notice and a hearing at which the Government must justify the renewed deprivation. See *Boumediene*, 553 U.S. at 779–80 ("depending on the circumstances, more [relief] may be required").

## CLAIMS FOR RELIEF

### COUNT I

### Violation of the Fourth Amendment and Implementing Regulations

### (Unlawful Seizure and Warrantless Arrest)

88. Petitioner repeats, re-alleges, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

89. Respondents' officers seized Petitioner without reasonable suspicion, on the basis of his apparent race and ethnicity and his mere proximity to an address, in violation of the Fourth Amendment. *Brignoni-Ponce*, 422 U.S. at 885–87; *Montero-Camargo*, 208 F.3d at 1135.

90. Respondents' officers then arrested Petitioner without a warrant and without any reason to believe he was likely to escape before a warrant could be obtained, in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(b)(2), (c)(2)(ii), regulations by which Respondents are bound. *Accardi*, 347 U.S. at 265–68.

91. These violations were egregious. *Gonzalez-Rivera*, 22 F.3d at 1449–52. Petitioner's confinement originated in, and is the direct product of, the unconstitutional seizure and unauthorized arrest, and it has never since been subjected to any individualized justification. Petitioner is accordingly in custody in violation of the Constitution and laws of the United States, 28 U.S.C. § 2241(c)(3), and is entitled to release.

## COUNT II

## Violation of the Equal Protection Guarantee of the Fifth Amendment

## (Racial Profiling)

92. Petitioner repeats, re-alleges, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

93. The Fifth Amendment's Due Process Clause forbids the federal government from denying any person the equal protection of the laws, including through the intentionally discriminatory application of the immigration laws on the basis of race or ethnicity. See *Whren*, 517 U.S. at 813.

94. Respondents' officers selected Petitioner for investigation and arrest because of his apparent race and ethnicity. The government's contemporaneous record identifies no other basis for the decision to approach him, and the asserted "resembl[ance]" to a different Latino man—unaccompanied by any articulated shared characteristic, never explained to Petitioner at the scene, and recorded in a document that misdescribes Petitioner in material respects, down to the number of arms nature gave him—was a proxy for ethnicity. (Exhibit C at 1–3; Exhibit I ¶¶ 8–9, 19.)

95. Petitioner's confinement is the direct product of that discriminatory enforcement and therefore violates the equal protection guarantee of the Fifth Amendment. Petitioner is entitled to release.

**COUNT III**

**Violation of the Due Process Clause of the Fifth Amendment**

**(Detention Without Process; Revocation of a Prior Release Without a Hearing)**

96. Petitioner repeats, re-alleges, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

97. The government may not deprive a person of life, liberty, or property without due process of law. U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that the Clause protects." *Zadvydas*, 533 U.S. at 690. Civil confinement must bear a reasonable relation to a legitimate purpose. *Jackson*, 406 U.S. at 738. "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Salerno*, 481 U.S. at 755.

98. Respondents have confined Petitioner for more than two months—with many more months of confinement ahead while his administrative appeal is pending—without any decisionmaker ever making an individualized determination that his confinement serves any purpose. That confinement without process violates the Due Process Clause.

99. Respondents released Petitioner on his own recognizance in July 2025 and then revoked that liberty eleven months later without notice, without a hearing, and without alleging that he had violated any condition of his release. Due process forbids the revocation of a conditional liberty the Government itself conferred without a hearing held before the deprivation. *Morrissey v. Brewer*, 408 U.S. 471,

482 (1972); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973); *Young v. Harper*, 520 U.S. 143, 152 (1997); *Zinermon v. Burch*, 494 U.S. 113, 127 (1990); see *Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1032 (N.D. Cal. 2025); *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 969 (N.D. Cal. 2019).

100. By arresting and detaining Petitioner without lawful authority, Respondents also denied him every procedural protection the governing framework prescribes—no warrant, no individualized custody determination, no determination within 48 hours of his warrantless arrest, no Form I-286, and no notice of any mechanism for seeking review—thereby creating an unacceptably high risk that his confinement serves no lawful purpose at all. See *Garcia-Maya v. Mattos*, No. 2:26-cv-01513-RFB-BNW, 2026 WL 1965886, at *5, *8 (D. Nev. July 7, 2026); *Dominguez Perez v. Santacruz*, No. 5:26-cv-03936-MBK, slip op. at 14 (C.D. Cal. July 30, 2026).

101. Respondents may not cure that violation by invoking Petitioner's removal order as a post hoc justification for his confinement. The order was entered through a hasty, paper-only adjudication, over Petitioner's objection, before any evidence could be assembled and before Petitioner was ever placed under oath, and Petitioner is timely appealing it to the BIA. Due process forbids the government from leveraging the fruits of its own truncated process to justify

continued detention. The appropriate remedy for Petitioner's unlawful confinement is release.

**COUNT IV**

**Violation of the INA and Implementing Regulations**

**(Detention Without Statutory Authority)**

102. Petitioner repeats, re-alleges, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

103. Petitioner's detention is governed by 8 U.S.C. § 1226(a). *Rodriguez Vazquez v. Bostock*, No. 25-6842, 2026 WL 2196424 (9th Cir. July 30, 2026). Section 1226(a) authorizes arrest and detention "[o]n a warrant issued by the Attorney General." No warrant issued for Petitioner's arrest, and the sole statutory exception, 8 U.S.C. § 1357(a)(2), was never satisfied: Respondents formed no belief—and on the facts known to them could have formed none—that Petitioner was likely to escape before a warrant could be obtained.

104. Respondents likewise violated the implementing regulations by which they are bound: 8 C.F.R. § 287.8(b)(2) and (c)(2)(ii); 8 C.F.R. § 236.1(b) (arrest under the authority of a Form I-200); 8 C.F.R. § 287.3(d) (custody determination within 48 hours of a warrantless arrest); and 8 C.F.R. § 1236.1(c)(8) (individualized custody factors). *Accardi*, 347 U.S. at 265–68; *Calderon-Medina*, 591 F.2d at 531. These provisions exist for the benefit of the person arrested, and

their violation has cost Petitioner more than two months of physical liberty without any determination, by anyone, that his confinement is justified.

105. Nor does any statute mandate Petitioner's detention. He is not detained under 8 U.S.C. § 1231, because his removal order is not administratively final. 8 U.S.C. § 1231(a)(1)(B)(i); 8 C.F.R. § 1241.1. And he is not subject to mandatory detention under 8 U.S.C. § 1226(c), because he has never been arrested for, charged with, or convicted of any offense. Respondents have therefore held Petitioner for more than two months under a statute that authorizes his release, without any of the "several layers of review" that § 1226(a) guarantees. *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1202 (9th Cir. 2022).

106. Because the statutory and regulatory preconditions of Petitioner's arrest and custody were never satisfied, there is no lawful authority for his detention. Petitioner is in custody in violation of the laws of the United States, 28 U.S.C. § 2241(c)(3), and immediate release is required.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner prays that this Court grant the following relief:

a. Assume jurisdiction over this matter;

b. Issue an order to show cause requiring Respondents to file a return within three days pursuant to 28 U.S.C. § 2243;

c. Issue a writ of habeas corpus requiring that within one day, Respondents release Petitioner, without the imposition of any restraints on his liberty such as reporting requirements, GPS monitoring, or electronic monitoring, and return to him any property and documents confiscated upon his arrest;

d. Order Respondents to file a status report confirming Petitioner's release within forty-eight hours of his release;

e. Enjoin Respondents from transferring Petitioner from the jurisdiction of this District, and from removing Petitioner from the United States, pending these proceedings and pending the administrative finality of his removal proceedings;

f. Enjoin Respondents from redetaining Petitioner without first providing at least seven days' notice and a hearing before an Immigration Judge, held prior to any redetention, at which the Government bears the burden of establishing by clear and convincing evidence that Petitioner is a danger to the community or a risk of flight and that no condition or combination of conditions of release would reasonably assure his appearance and the safety of the community;

g. Declare that Respondents' seizure and warrantless arrest of Petitioner violated the Fourth Amendment, the equal protection guarantee of the Fifth Amendment, 8 U.S.C. §§ 1226(a) and 1357(a)(2), and 8 C.F.R. §§ 236.1(b), 287.3(d), and 287.8; that Petitioner's detention is without statutory authority; and that his continued detention violates the Due Process Clause of the Fifth Amendment;

h. Award Petitioner fees and costs under the Equal Access to Justice Act ("EAJA"), as amended, 28 U.S.C. § 2412, and on any other basis justified under law; and

i. Grant any other and further relief that this Court deems just and proper.

Dated: September 2, 2026

Respectfully submitted,

/s/ Howard J. McClure
Howard J. McClure

Counsel for Petitioner

Howard J. McClure, Esq. #141046
Aubrey J. McClure Campbell, Esq. #313033
Howard J. McClure & Associates
743 N. A St.
Oxnard, CA 93030
(805) 278-6117 * Fax (805) 278-6119
Attorneys for Petitioner

**VERIFICATION PURSUANT TO 28 U.S.C. § 2242 AND 28 U.S.C. § 1746**

I, Howard J. McClure, declare:

1. I am counsel for Petitioner, Luis Fernando Juarez-Perez, in the above-captioned matter. Pursuant to 28 U.S.C. § 2242, I submit this verification on his behalf.

2. I have personal knowledge of the facts stated below based on my representation of Petitioner and review of the record.

3. I have reviewed the foregoing Petition for Writ of Habeas Corpus and the accompanying exhibits. The factual statements therein are true and correct to the best of my knowledge, information, and belief, based on my personal knowledge and the records maintained in the ordinary course of my representation.

4. I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 2, 2026.

/s/ Howard J. McClure
Howard J. McClure

Counsel for Petitioner